# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 3:18CR186 |
| ) | |
| Plaintiff, ) | ***DEFENDANT'S SENTENCING*** |
| v. ) | ***MEMORANDUM*** |
| ) | |
| ASIF AHMED SALIM, ) | |
| Defendant. ) | |

The Defendant, Asif Ahmed Salim, through counsel, respectfully submits this sentencing memorandum in connection with his sentencing by the Court on October 22, 2018, for the crime of Concealment of Financing of Terrorism in violation of 18 U.S.C. §§ 2339C(c)(2)(B). Mr. Salim accepts full responsibility for his actions, and through this memorandum seeks to provide the Court with information pertinent to the appropriateness of the sentencing limitations as set out in the terms of his plea and to aid the Court in crafting an appropriate sentence pursuant to the factors set forth in 18 U.S.C. § 3553.

**I.     BACKGROUND**

The defendant, along with his older brother Sultane Roome Salim, (hereinafter S.R. Salim), Yahya Farooq Mohammad, (hereinafter Y.F. Mohammad), Ibrahim Zubair Mohammad (hereinafter I.Z. Mohammad), were initially charged with three counts of a four count indictment alleging Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A (Count 1); Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A (Count 2); and Conspiracy to Obstruct Justice, in violation of 18 U.S.C. § 1512(k) (Count 4). (R. 1: Indictment, Page ID 1-72). The indictment alleged that Salim conspired to provide, and did provide, funds in the amount of $2,000 to Anwar Al-Awlaki, (hereinafter Al-Awlaki) for use in conducting terrorist attacks.  The indictment further

1

alleged that the defendant and his co-conspirators later conspired to obstruct the FBI's investigation into the conveyance of these funds to Al-Awlaki.

Subsequent to the indictment Y. F. Mohammad entered into a separate conspiracy to commit Murder for Hire and to Murder and a Federal Official – the presiding trial judge. Consequently, Y. F. Mohammad's charges were severed from his co-defendants. Ultimately, Y. F. Mohammad pled guilty to conspiracy to provide material support to terrorism and conspiracy to murder a federal official. Following his plea, Y. F. Mohammad was sentenced to 330 months - 150 months for the Conspiracy to Commit Material Support of Terrorism and 240 months for the Conspiracy to Commit Murder of a Federal Official, 90 months of which are to run concurrently with the 150 months.

On April 13, 2018, the defendant, along with his brother S. R. Salim, by way of information and pursuant to a plea agreement, under Rule 11(c)(1)(C) pled guilty to Concealment of Financing of Terrorism in violation of 18 U.S.C. § 2339C(c)(2)(B).[1] Section 2339C(c)(2)(B) provides for a sentence of up to ten years imprisonment. Under the terms of Mr. Salim's plea agreement, his sentence is, however, capped at eight years of confinement. The Court is not otherwise limited in the sentence it may award. At the time of the defendant's plea, the Court deferred determination of acceptance of the sentencing limitations pending review of the defendant's pre-sentencing report. The pre-sentencing report notes that the recommend guidelines sentence for the defendant's conduct is the maximum sentence of ten years based on the stipulated guidelines calculations. Accordingly, the probation officer advised the Court that "[I]f the Court fails to identify valid grounds for a departure or a sentence outside of the guidelines, and adopts the

---

[1] Ibrahim Zubair Mohammad plead guilty to Concealment of Financing of Terrorism in separate proceedings on April 11, 2018.

[2] The International School of Creative Science is an English language private elementary school with a curriculum

probation officer's guideline calculation, the Court may need to consider giving the defendant an opportunity to withdraw from the guilty plea." This advice is in accordance with Guidelines Manual mandate in §6B1.2(c) (Nov. 2016) (USSG) that a Court should not accept a Rule 11(c)(1)(C) plea where the agreed sentence is outside the applicable guidelines range absent justifiable reasons. The Supreme Court recently re-emphasized in *Hughes v. United States*, 138 S. Ct. 1765, 1776 (2018) that "The Sentencing Guidelines prohibit district courts from accepting Type-C agreements without first evaluating the recommended sentence in light of the defendant's Guidelines range." The defendant further agrees that under Rule 11(c)(1)(C), in the event the Court determines there is no reason for a sentence outside the guidelines range and does not accept the cap, the Court must advise the defendant of the ability to withdraw from the plea agreement prior to imposing any sentence. For the reasons set forth below, the defendant respectfully requests that the Court accept the Rule 11(c)(1)(C) cap of 96 months (eight years), but impose a lower sentence of not more than 46 months.

## II. SENTENCING ANALYSIS UNDER 18 USC § 3553

Under *United States v. Booker*, 543 U.S. 220 (2005), the Court is directed to impose a sentence under 18 U.S.C. § 3553(a). In compliance with 18 U.S.C. § 3553(a), the Court is to impose a sentence "sufficient, *but not greater than necessary*" to comply with the purposes of punishment. *See Kimbrough v. United States*, 552 U.S. 85, 111 (2007) ("sufficient, but not greater than necessary" requirement is the "overarching instruction" of § 3553(a)). In determining a sentence "sufficient, but not greater than necessary", a Court is to consider several factors, including (as relevant here) "the nature and circumstances of the offense and the history and characteristics of the defendant," *Id*. § 3553(a)(1); the guidelines

sentencing range and any applicable Sentencing Commission policy statements, *Id.* § 3553(a)(4), (5); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *Id.* § 3553(a)(6).

A. <u>History and Characteristics of the Defendant</u>

The defendant is 38 years old and a natural born U.S. citizen, born and raised in Cambridge, Ohio. In addition to his older brother, the defendant has two sisters Farah Salim and Ashia Salim, ages 39 and 35 respectively. The defendant grew up in rural Ohio and after completing high school attended and graduated from Ohio State University in 2005 with a Bachelor of Science degree in geography. After graduation, the defendant married Farah Nizamuddin, an elementary school teacher, in December of 2005. The couple has four children, Asiyah Salim, age ten; Khalid Salim, age nine; Zainab Salim, age five, and Shamil Salim, age four. By all accounts, Asif is a devoted and loving father and family man.

Following his graduation, the defendant initially worked as an implantation analyst for GE Oil and Gas, from October of 2007 until he was laid off in June of 2009 during the recession. After being laid off, the defendant was unable to find comparable work, and ultimately left the United States to take a teaching position at the International School of Creative Sciences in Dubai from September of 2011 until June of 2012.[2] After teaching for a year at Creative Sciences, the defendant accepted an offer from Gistec in Sharjah, Dubai.[3] Gistec provides professional services to companies with a specialization in the development of intelligent, cloud-based, and enterprise-wide geospatial data solutions for clients in a variety of

---

[2] The International School of Creative Science is an English language private elementary school with a curriculum based on the National Curriculum of England.
[3] Gistec is the official distributor for Esri in Dubai. Esri is an international supplier of geographic information system software, web GIS and geodatabase management applications. Esri's headquarters are located in Redlands, California.

disciplines and industries. The defendant started in a training position with Gistec and thereafter was promoted to a professional services manager prior to his arrest in September of 2015.

In determining a sentence "sufficient, but not greater than necessary" to provide "just punishment," the Court must consider the "characteristics of the defendant." 18 U.S.C. § 3553(a)(1) Apart from the criminal charges in this case, the defendant has no criminal record with the instant offense representing but a single blemish on an otherwise law abiding and hardworking life. The letters to the Court praise Salim as a devoted father and husband. We have provided the Court with letters from his wife and children, his in-laws and others that leave no doubt that Asif Salim is a good man and an essential and positive influence on his family. [4] (*Exhibit A Under Seal*)

These letters praise Asif's devotion as a father, calling his children every day, discussing their lives and teaching them lessons of kindness and responsibility. The poignant letter from his oldest child describing the last time she saw her father, describes him as playful, loving, and teaching the importance of helping others. His niece described the lessons her uncle taught her: "a good Muslim means being a good citizen", and to "obey all laws". She saw his concern for the poor migrant workers when they lived in the UAE, something a coworker also described. His wife has described him as an engaged, caring and patient father, in partnership, raising their children together. He is described both by family and friends as someone who served others in a selfless way, tutoring underprivileged children.

Most telling are the letters from his mother and father in law, presumably a husband's harshest critics in many families. This is not so in Asif's case. His father in law, who suffers from Parkinson's, describes Asif as gentle and patient, calling him his 'son'. His sister in law

---

[4] We have furnished the letters to the Court and the government. To protect the privacy of the writers, we ask that the Court include a set of the letters in the record under seal.

describes him as a responsible father and husband. These should be most relevant to the Court when recalling that they all put up their family homes for Asif's bond, displaying certain confidence that he would never jeopardize their trust in him and, and for which this Honorable Court, ordered Asif's release. Even when Asif faced more serious and consequential charges and potentially longer incarceration, Asif was found to be no danger to the community and no risk of flight.

Of relevant note, is how Asif has behaved as a model inmate during his nearly 3 years in custody. As the letter from the Corrections Administrator of the Lucas County Sheriff's Department, Major Sylvester, reports, Asif has had no disciplinary infractions, not one, during his lengthy pretrial confinement. *Exhibit B*. Asif displayed the characteristics of someone who obeys the rules in the most difficult environment. This mirrors the manner in which he has led his life and is corroborated by those who know him best, his family and friends.

B.  The Events Giving Rise to the Offense Conduct

In the years prior to the defendant's financial contribution to Al-Awlaki, the defendant and the other individuals charged in this case exchanged emails regarding the religious justifications for armed resistance to foreign occupation of historically Muslim lands, the need to adhere Islamic teachings and need for actions by believers. None of these e-mails in which the defendant was largely a passive participant, blind copied for the majority of the messages, proposed a course of action. That changed when Y. F. Mohammad began a scheme to obtain cash through the fraudulent use of credit cards in 2008[5] and decided to provide financial support to Al-Awlaki.

Al-Awlaki is of course an infamous figure in the War on Terror, but that was not always

---

[5] While there is evidence that Y. F. Mohammad's brother I.Z. Mohammad was aware of and assisted his brother's scheme, there is no evidence that the defendant knew that Y.F. Mohammad was using raising money through fraudulent charges to his credit card.

6

so.[6] Prior to 9/11, Al-Awlaki had served as an Imam in Falls Church, Virginia, and gained national attention in the American Muslim community through a series of lectures on the Life of Muhammad and other topics that were devoid of radicalism.[7] While serving as an Imam in Falls Church, Al-Awlaki came in contact with three of the 9/11 hijackers, a fact publicized in the 9/11 report. Apart from the fact that one of the hijackers had Al-Awlaki's contact information, there was no evidence that Al-Awlaki was then a member of Al-Qaeda, had any foreknowledge of the attack, or in anyway aided it. Al-Awlaki nevertheless became a target of suspicion and investigation. In 2002, Al-Awlaki left the United States and went to Britain. While in Britain, Al-Awlaki generically argued in his lectures that the West was at war with Islam, described the rewards martyrs who fought for Islam would receive, and discouraged Muslims against cooperating with the West in betraying and turning over fellow Muslims.

In 2004, Al-Awlaki left Britain and returned to Yemen, where he lectured at the Imam University in Sana'a until Yemeni officials arrested him in 2006, ostensibly for being part of a plot to kidnap a Shite teenager. Al-Awlaki was not, however, officially charged, and was ultimately released in December of 2007. After being released he started a website and began promoting support for armed resistance of foreign intervention in Muslim lands, arguing it was legitimate Jihad and that its support was a religious obligation. The content was available in English and became the inspiration for multiple individuals in the US and Great Britain to engage in terrorist activities. The content included: Constants on the Path of Jihad, recorded in 2006, prior to Al-Awlaki's arrest and subsequently posted on his website after his release; 44 Ways of Supporting Jihad, posted on January 5, 2009; and a letter in support of Al-Shabaab, posted in December, 2008. It is during this time that Al-Awlaki came to the attention of Y.A.

---

[6] News accounts serve as the primary basis for the defendant's facts concerning Al-Awlaki. In this case, news accounts are an appropriate basis because the parties' stipulation of fact regarding the defendant's knowledge is based on the public statements of Al-Awlaki.
[7] See Imam's Path From Condemning Terror to Preaching Jihad Shane, Scott; Souad Mekhennet (May y 8, 2010 NY Times.

Mohammad and the other defendants, including Asif Salim.

What is most important to note that it is undisputed that Asif Salim's knowledge of Al-Awlaki's activities when he agreed to provide funds to Y.A. Mohammad in July of 2009, was based on Al-Awlaki's writing and the public reporting on him. Prior to late 2009, neither the reporting nor the writing indicated that Al-Awlaki was an active participant in armed acts against American forces, or any other force, nor was there any indication that Al-Awlaki was an active member of any designated terrorist organization or undesignated armed force or acting under the control of such an organization or financially supporting them. Instead, Al-Awlaki was vocal but apparently an independent advocate promoting these organizations' goals and activities, including making financial contributions to them. This is certainly morally objectionable, but it did not constitute knowing and intentional support of a terrorist act as alleged in the first indictment.[8]

Shortly after Asif Salim's contribution, the public and governmental perception of Al-Awlaki's role changed with the attack by Nidal Hasan (the Fort Hood shooter). Hasan committed the Fort Hood shooting on November 5, 2009. Prior to the attack, Hasan engaged in email correspondence with Al-Awlaki between December of 2008 and June of 2009, whom Hasan knew from Al-Awlaki previously having officiated at Hasan's mother's funeral. While the FBI was apparently aware of this correspondence prior to the attack, there is no evidence that Asif, or any of the other conspirators, were aware of it. Following the attack, Al-Awlaki praised the shooting on Nov 9, 2009, on his website and Al-Awlaki's connection to Hassan was publicized two days later.[9] Al-Awlaki admitted his contact with Hasan in an interview with Al

---

[8] In contrast Y.A. Mohammad apparently knew that the funds were to be used for a training camp based on conversations with one of the unknown conspirators, but there is no evidence that he shared that information with Asif Salim.
[9] See https://www.nytimes.com/2009/11/10/us/10inquire.html

8

Jazeera in December of 2009. [10] Al-Awlaki's connections to Hasan (directly referenced in the PSR and agreed facts) was not common knowledge until after Y.F. Mohammad delivered the funds to Al-Awlaki via an intermediary in July of 2009. Thus, if Asif Salim's knowledge of Al-Awlaki's relationship with Hasan played a role in knowing that the funds given to Al-Awlaki were used in funding murder and maiming, the knowledge was necessarily after the funds had been delivered.

Likewise, Al-Awlaki's direct involvement with numerous terrorists' organizations was not known until after Y.F. Mohammad delivered the funds. Al-Awlaki began appearing in Al-Qaeda in the Arabian Peninsula videos in early 2010 where he called for direct attacks against the United States and was announced as member of the group in May of 2010. The fact that he was being actively targeted by the United States as an enemy combatant posing a clear and present danger to the US was reported in the Washington Post on April 7, 2010. Miller, Greg (April 7, 2010). "Muslim cleric [Al-Awlaki] is 1st U.S. citizen on list of those CIA is allowed to kill". Thereafter, until being killed in drone strike, he is believed to have been exclusively in Al-Qaeda's company. On July 16, 2010, the Department of the Treasury designated Al-Awlaki.[11]

In short, after Asif gave the money, the news reporting in late 2009 and early 2010, and Al-Awlaki's own statements, made it clear that Al-Awlaki had made the transition from inspirational speaker to active participant.

Asif Salim in his plea and statement of responsibility, stated that based on the reporting outlined above, he realized at this point that the funds he had given had been likely used for terrorism, rather than for Al-Awlaki's personal use or to further his on-line campaign against

---

[10] https://abcnews.go.com/Blotter/FtHoodInvestigation/fort-hood-hasan-asked-awlaki-kill-american-soldiers/story?id=9410718; See also https://www.nytimes.com/2010/02/01/world/middleeast/01yemen.html.
[11] https://www.treasury.gov/press-center/press-releases/Pages/tg779.aspx

America's foreign policy. Regretful and fearful of the ramifications of his actions, Asif Salim deleted his emails related to Al-Awlaki and tried to forget the whole thing. Later, when confronted by the FBI during an interview in Dubai, he lied about the funds and claimed that he had given them to Y.F. Mohammad as a business investment. As is often the case for many defendants, it was the cover-up that ultimately became the crime.

C. The Guidelines Sentencing Range

In this case, because of the terrorism enhancement under USSG § 3A1.4(a), the adjusted offense level is 36 with criminal history of V resulting in a guidelines sentencing range, as agreed to by the parties, as 342 to 405 months, or approximately three times the statutory maximum of 120 months. Because the guideline range exceeds the statutory maximum, 120 months is the guidelines sentence. Even the government, however, agrees that 120 months is in excess of what is reasonable and necessary in this case.

In fact, this case is a text book example of why *United States v. Booker*, 543 U.S. 220, 259-60 (2005), and its progeny, hold that the guidelines are merely one factor for the Court to consider at sentencing, along with the other factors enumerated in § 3553(a). This discretion to vary from the guidelines is important in order to impose a just sentence in accordance with 18 U.S.C. §3553(a). The Supreme Court emphasized in *Nelson v. United States*, 129 S. Ct. 890 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." 129 S. Ct. at 892 (emphasis in original). This case demonstrates the truth of that statement by recommending a sentence far in excess of the maximum.

With respect to a violation of 18 U.S.C. §2339C, the guideline sentence provides the Court with little to no guidance. Relying on the guidelines sentence in all cases would result in a default sentence of the maximum statutory term of 120 months, regardless of the amount of sophistication, motivation, or the presence of any victim. No other financial crime is treated

this way.

Further, the guidelines application in this case is a function of how Asif Salim was charged. Asif Salim's primary concealment of the funds was lying to the FBI regarding their purpose. For this conduct he could have been equally charged with making a false statement involving international terrorism under 18 U.S.C. § 1001. Were that the case, the maximum sentence would have been eight years and his guideline range based USSG §2J1.2(b)(1)(C), with the adjustment for acceptance of responsibility, would have resulted in an offense level of 23. The criminal history category would have been one instead of five resulting in a recommend sentence of 46 months to 57 months. In short, the guidelines application is not based on the culpability for course of criminal conduct but on a charging decision and should not be presumed reasonable under the circumstances and warrant deviation. While the government undoubtedly will seek the high end of the Cap, their agreement should be considered by the Court as recognition of what is plain in view - the defendant's conduct in this case does not merit the suggested overly harsh guidelines range.

D.  Unwarranted Sentence  Disparities

The Center on National Security at Fordham Law has published a study "Case by Case of ISIS Prosecutions in the United States examining all ISIS related prosecutions between March 1, 2014 – June 2016."[12]  The most prevalent charge in these cases was a violation of 18 U.S.C. § 2339B (material support of a terrorist organization), which is punishable by a maximum of twenty years imprisonment or, if death results, life in custody. Each of the cases necessarily involved the subject of a terrorism enhancement as is present in this case, which resulted in a recommended guidelines sentence of twenty or more years

---

[12]Available at
https://static1.squarespace.com/static/55dc76f7e4b013c872183fea/t/577c5b43197aea832bd486c0/1467767622315/ISIS+Report+-+Case+by+Case+-+July2016.pdf

depending on whether additional charges were included. Despite these facts, the average sentence was 9.2 years. Although, none of these cases included violations of 18 U.S.C. §§ 2339C, the study makes clear that courts are not adhering to the guidelines recommendations and they are imposing substantially lower sentences than those recommended as a result of the terrorism enhancement.

Asif Salim bears a striking similarity to many of the defendants in these cases who are young men who were momentarily caught up in the rhetoric of Jihad, but were otherwise law abiding persons rather than the career, violent criminal envisioned by the guidelines. As such, a departure for Mr. Salim will not create an unwarranted disparity. Quite the contrary - imposing the maximum sentence for the offense instead would actually constitute an unwarranted disparity in his treatment in the scheme of recent terrorism sentencing.

**III.     PURPOSES UNDER 18 USC § 3553(a)(2)**

Under 18 U.S.C. § 3553, the court is instructed that it "shall impose a sentence sufficient, but not greater than necessary."

A.     <u>Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense</u>

A sentence of 46 months satisfies these overarching sentencing concerns. The aberrant act of an otherwise honest man, with an unblemished professional and personal life and no criminal record whatsoever, does not call for a severe a sentence. Forty six (46) months is the low end of the suggested guidelines for false statements in a terrorism investigation, which is the essence of the criminal conduct here. Low end is appropriate because of the circumstances. Asif Salim made his false statement not to further ongoing criminal activity, but to protect his reputation, career and family. Asif Salim has admitted this mistake and is truly remorseful. Given, the amount of money in question, his relatively minor role in the course of criminal conduct, and his acceptance of responsibility, if the investigation had not involved terrorism, a

12

sentence of probation would unquestionably be sought. Forty six (46) months recognizes the dangers imposed by terrorism offenses and the need that persons do not impede such investigations, while being proportional to the criminal conduct. A substantially longer sentence, on the other hand, does not promote respect for the law or provide for just punishment because, as explained below, is greater than necessary.

B.    The Resultant Sentence Constitutes Adequate and Appropriate Deterrence

Deterrence is composed of specific deterrence and general deterrence. Specific deterrence is what is necessary to deter the defendant from further misconduct, and general deterrence is what is necessary to deter others. In a case such as this centered on aberrant conduct, significant additional confinement is not necessary to deter Asif Salim. His actions after the offense but prior to arrest, and his actions after arrest, both demonstrate that he had no intent to commit further criminal conduct. There is no evidence that he has continued down the path of violent extremism. Instead, Asif Salim found a productive place in society and set about raising a family. Nor has his arrest and prosecution hardened his heart and turned Asif Salim back toward a path of crime. Over the three years he has been incarcerated, Asif Salim has been a model prisoner. When offered the opportunity to plead to the criminal conduct he had clearly committed, he accepted it and took responsibility for his actions.

Not only will a sentence of 46 months adequately deter Asif Salim from committing similar crimes, it has also sent a message to members of the Community of the need to be careful and truthful when providing funds to persons overseas, particularly those who wish us harm. While some might argue that a harsher the sentence is necessary to send a strong message to the Muslim community, a sentence that is harsh for harshness sake does not deter, it angers. Fear may work in the short term but the anger that follows from a belief that justice was not done, ultimately erodes the trust that is necessary to prevent the scourge of messengers like

13

Al-Awlaki from undermining a free and democratic society. Defendant's counsel respectfully submits that 46 months strikes that balance.

C.  The Need to Protect the Public from Future Crimes by Defendant

This factor is inapplicable here: there is no basis to be concerned that Asif Salim will be a recidivist or otherwise poses any potential harm to the community. His history before and after the criminal conduct demonstrates that he is not a danger to the public. Prior to making the contribution to Al-Awlaki and then lying about it, Asif Salim had never committed a crime. After learning of Al-Awlaki's direct participation in terrorism, Asif Salim was not inspired to commit to continue to support terrorism but instead tried to put the mistake behind him. Ultimately, he chose to lie about his conduct in an effort to protect the life that he had built for his family and himself. This is a one-time mistake and there is no reason to believe that he requires significantly more confinement to protect society. Asif Salim's adherence to the prison rules without a single disciplinary infraction demonstrates his ability and intent not to commit further crimes. In short, there is nothing about the Asif Salim who stands now before the Court to suggest that he is the violent career offender envisioned by the terrorism enhancement.

D.  The Need for Care, Treatment or Training of Defendant is Not Implicated

This concern is not implicated in Asif Salim's case. He has no condition requiring treatment or specialized care, and additional confinement will not result in greater professional and vocational credentials and experience that might reduce his risk of recidivism.

**IV.  REQUESTED FINDINGS AND SENTENCING RECOMMENDATION**

A.  Approval of the Rule 11(c)(1)(C) Plea

The defendant, through counsel, prays that this honorable Court accept the Rule 11(c)(1)(C) plea agreed to by parties and find for the reason set forth above: including but not limited to the defendants characteristics, the underlying criminal conduct, the need to prevent

disparities, and the purpose of sentencing there are justifiable reasons for a sentence below the suggested guidelines for the offense of conviction.

B. <u>A Term of 46 Months and without a Fine is the Appropriate Sentence</u>

The defendant further prays that this honorable Court award a sentence of 46 months for the reasons set forth above; and for the reasons set forth below, not award a fine.

The defendant respectfully submits that under the factors set out in § 3572, a fine is not appropriate in his case. The factors under § 3572(a) on whether to impose a fine and the magnitude include the defendant's income, earning capacity, and financial resources; the burden that the fine will impose on the defendant or any dependents; any loss to victims of the offense; whether restitution has been ordered; the need to deprive the defendant of illegally obtained gains; and the costs to the government of incarceration. 18 U.S.C. § 3572(a). Asif Salim and his family lost all their personal belongings when he was arrested, as attested to by his wife in her letter to the Court. They are now just rebuilding their lives. Asif Salim intends to work hard to reconstitute their family lives and has learned what a horrible mistake he made. *Wisdom comes through suffering. Aeschylus.*

Asif Salim agrees with the PSR that he does not have the ability to pay a fine within the guideline; and that any fine would impose severe hardships. Further, Asif Salim would have been eligible for counsel at public expense but instead borrowed the cost for counsel from his in-laws, thereby saving the government the expense, but leaving him in considerable debt. Accordingly, he requests that the Court not award a fine in this case.

DATED this 10th day of October, 2018

Respectfully submitted,

    */s/ Linda Moreno*
Linda Moreno

        Counsel for Asif Salim
        lindamoreno.esquire@gmail.com
        Linda Moreno P.A.
        511 Avenue of the Americas, No. 312
        New York, New York 10011
        813-247-4500

CERTIFICATE OF SERVICE

      The undersigned certifies that a copy of this foregoing Defendant's Sentencing Memorandum was electronically filed and served on the persons listed below by CM/ECF and e-mail:

      DATED this 10th day of October, 2018.

                                                              */s/ Linda Moreno*
                                                        Linda Moreno
                                                        Counsel for Asif Salim
                                                       lindamoreno.esquire@gmail.com
                                                       Linda Moreno P.A.
                                                       511 Avenue of the Americas, No. 312
                                                       New York, New York 10011
                                                       813-247-4500